IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| XO SHIPPING A/S, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | |
| ) | |
| ENERGY COAL SPA and ENERGY COKE SRL, ) | |
| ) | |
| Defendants. ) | |

**<u>VERIFIED COMPLAINT IN ADMIRALTY</u>**

Plaintiff XO Shipping A/S ("Plaintiff" or "XO"), by and through its undersigned counsel Palmer Biezup & Henderson, LLP, files this Verified Complaint in Admiralty against Defendants Energy Coal SPA ("Energy Coal") and Energy Coke SRL ("Energy Coke") (collectively, "Defendants") and alleges, upon information and belief, as follows:

**JURISDICTION**

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it arises out of a maritime contract or transaction and, therefore, falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333.

2. Federal jurisdiction also exists because the action arises under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§201, *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §§1, *et seq.*, and, therefore, falls under this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.

3. Federal jurisdiction exists over any and all other claims in that they are so related to claims in the action within the Court's original jurisdiction that they form part of the same

1

case or controversy and, thus, fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367.

4. Venue is properly situated in this District because, upon information and belief, Defendants have, or will soon have, property within this District that may be attached through the process of maritime attachment and garnishment pursuant to Rule B, i.e., a cargo of petcoke being or soon to be loaded on board a vessel in the port of Wilmington, which cargo is, upon information and belief, presently within this District and being held or otherwise controlled by, on behalf of or for the benefit of Defendants.

## THE PARTIES

5. At all times material hereto, Plaintiff XO was and is a foreign business entity duly organized and existing under the laws of a foreign country with an address in Denmark.

6. At all times relevant hereto, Defendant Energy Coal was and still is a foreign business entity organized and existing under the laws of Italy with a registered office and principal place of business at Via San Vincenzo, 2 A – 16121 Genova, Italy. Energy Coal is a wholly owned subsidiary of non-party Ice Holding Srl. Energy Coal is the 100% parent of Energy Coke.

7. At all times relevant hereto, Defendant Energy Coke was and still is a foreign business entity organized and existing under the laws of Italy with a registered office and principal place of business at Via San Vincenzo, 2 A – 16121 Genova, Italy. Energy Coke is a wholly owned subsidiary of Energy Coal.

8. At all times relevant hereto, non-party Ice Holding Srl was and still is a foreign business entity organized and existing under the laws of Italy with a registered office and

principal place of business at Via San Vincenzo, 2 A – 16121 Genova, Italy.  Ice Holding Srl is a 100% parent of Energy Coal which is, in turn, the 100% parent of Energy Coke.

## BACKGROUND

A.   **The GLOBAL ORIOLE Charter Party.**

9.   XO, as owner of the M/V GLOBAL ORIOLE, and Energy Coal, as charterer, entered into a voyage charter party on an amended Americanized Welsh Coal Charter form dated November 12, 2014 for the carriage of a cargo of 46,000 metric tons (10% more or less in XO's option) of coal from Wilmington, Delaware to one safe port South China on board the M/V GLOBAL ORIOLE (the "GLOBAL ORIOLE Charter Party", a copy of which is attached hereto as Exhibit 1).

10.   Under the terms of the GLOBAL ORIOLE Charter Party, Energy Coal was obligated to pay to XO freight at the rate of USD38.85 per metric ton of cargo.

11.   In addition, Energy Coal was obligated to pay to XO demurrage at the rate of $9,000.00 per day pro rata for time lost by the vessel at the loading and/or discharge port(s) beyond the agreed laytime period.

12.   XO duly delivered the vessel into the service of Energy Coal and performed all of its obligations under the GLOBAL ORIOLE Charter Party.

13.   On or about January 20, 2015, XO issued a final invoice to Energy Coal, showing a balance due in respect to freight and demurrage in accordance with the terms of the GLOBAL ORIOLE Charter Party.

14.   Despite due demand, Energy Coal refused or otherwise failed to pay the final invoice due and owing to XO in breach of the GLOBAL ORIOLE Charter Party, and the entire amount of USD118,653.25 remains due and outstanding to date.

15. The GLOBAL ORIOLE Charter Party provides that disputes will be resolved in arbitration in London with arbitration law and procedures prevailing in London to apply.

16. XO commenced arbitration against Energy Coal in London as provided for in the Charter Party.

17. On June 29, 2015, after carefully and conscientiously considering the documentary evidence and submissions put before him and giving due weight thereto, Mr. Simon Everton, the London sole arbitrator, issued a Final Arbitration Award, a copy of which is attached hereto as Exhibit 2, holding in favor of XO's claims against Energy Coal and directing Energy Coal to pay certain sums to XO as follows:

   a. USD118,653.25 in respect to XO's principal claims for freight and demurrage plus interest thereon at the rate of 4% per annum compounded quarterly from March 6, 2015;

   b. £3,250.00 (or USD4,990.66[1]) in respect to the costs of the Final Arbitration Award plus interest thereon at a rate of 4% per annum compounded quarterly from June 29, 2015; and

   c. XO's recoverable costs of the Final Arbitration Award to be assessed by the arbitrator on the basis set out in section 63(5) of the Arbitration Act 1996;

18. Despite due demand, Energy Coal has failed or otherwise refused to pay any portion of the Final Arbitration Award due to XO.

19. The entire amount due under the Final Arbitration Award, inclusive of the interest thereon as of September 22, 2015 (USD121,250.41 + USD5,037.15, which interest continues to accrue until the date of payment) plus XO's recoverable costs of the London arbitration

---

[1] Calculated based on GBP/USD exchange rate on September 22, 2015.

439518.1

proceeding (which, as nearly as can presently be computed, total USD8,000) is, as nearly as can presently be computed, USD126,287.56.

20. Energy Coal has in bad faith and/or without sufficient justification failed to pay any portion of the Final Arbitration Award to XO, and the entire amount of USD126,287.56 presently due remains unpaid to date.

21. XO now seeks an Order recognizing and confirming the Final Arbitration Award against Energy Coal as rendered by the London arbitrator, and reduction of that Award to a judgment of this Court for the purpose of its enforcement pursuant to Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the New York Convention"), 9 U.S.C. §§ 201, et seq., and the Federal Arbitration Act, 9 U.S.C. §§ 1, et seq.

22. XO also seeks an award of its attorneys fees and costs incurred in the prosecution of the instant action because Defendants have in bad faith and/or without sufficient justification failed to satisfy the Final Arbitration Award and have thereby created a needless waste of judicial and counsel resources, all of which are properly recoverable under the Court's admiralty and federal common law jurisdiction, and pursuant to the parties' agreement that provides for disputes to be resolved under English law, which provides for recovery of such sums.

23. XO estimates, as nearly as can presently be computed, that its legal fees and costs to be incurred in connection with the recognition and enforcement of the Final Arbitration Award will total USD20,000.

**B.    The DENAK VOYAGER Charter Party.**

24. XO, as owner of the M/V DENAK VOYAGER, and Energy Coal, as charterer, entered into a voyage charter party on an amended Americanized Welsh Coal Charter form dated November 26, 2014 for the carriage of a cargo of 60,000 metric tons (10% more or less in XO's

option) of petcoke from 1 safe berth St. James Bouys, Mississippi River for discharge at 1 SP Hazira, India on board the M/V DENAK VOYAGER (the "DENAK VOYAGER Charter Party", a copy of which is attached hereto as Exhibit 3).

25. Under the terms of the DENAK VOYAGER Charter Party, Energy Coal was obligated to pay to XO freight at the rate of USD36.85 per metric ton of cargo.

26. In addition, Energy Coal was obligated to pay to XO demurrage at the rate of USD19,500.00 per day pro rata for time lost by the vessel at the loading and/or discharge port(s) beyond the agreed laytime period.

27. XO duly delivered the vessel into the service of Energy Coal and performed all of its obligations under the DENAK VOYAGER Charter Party.

28. On or about February 16, 2015, XO issued a final invoice to Energy Coal, showing a balance due in respect to freight and demurrage in the amount of USD245,844.25 in accordance with the terms of the DENAK VOYAGER Charter Party.

29. Despite due demand, Energy Coal refused or otherwise failed to pay any portion of the final invoice due and owing to XO in breach of the DENAK VOYAGER Charter Party, and the entire amount of USD245,844.25 remains due and outstanding to date.

30. The DENAK VOYAGER Charter Party provides for the resolution of disputes in arbitration in London with English law to apply.  (See Exhibit 3).

31. Owing to Energy Coal's breach of the DENAK VOYAGER Charter Party, XO commenced arbitration proceedings against Energy Coal as provided for under the DENAK VOYAGER Charter Party.

439518.1

32. This action is brought *inter alia* pursuant to 9 U.S.C. §8 in order to obtain security for XO's claims made or to be made in arbitration, as agreed by the parties, and XO reserves the right to arbitrate this matter in London.

33. As a regular feature of English law and arbitration, attorneys fees are awarded to the successful litigant, along with costs, disbursements, the cost of the arbitration, and interest, all of which constitute a part of XO's main claim and the amount sued for herein.

34. XO estimates, as nearly as can presently be computed, that the legal fees and costs of prosecuting their claims in London will be USD35,000.00. Interest anticipated to be awarded is estimated to be USD33,814.50 (calculated at the rate of 5% per annum on the principal claim of USD245,844.25 and compounded quarterly for a period of 2 years, the estimated time for completion of the proceedings in London).

35. In all, the claim for which XO sues in this action, inclusive of the claims relating to the GLOBAL ORIOLE and DENEK VOYAGER Charter Parties, as near as presently may be estimated, totals **USD460,946.31** (plus additional interest which continues to accrue from the date of this Verified Complaint until payment is made), no part of which has been paid by Energy Coal, despite due demand. XO specifically reserves their right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure XO.

36. Upon information and belief, Energy Coal has an attachable property interest in a certain cargo of petcoke that is being loaded or will soon be loaded on board a vessel in the port of Wilmington.

37. By way of background, Energy Coal is an Italian entity that is engaged in the trading of coal and other raw materials.

38. On or about April 13, 2015, Energy Coal submitted an application pursuant to Article 161, Comma 6, B.L., in the Court of Genoa in Italy, seeking to be admitted to a special procedure named "composition with creditors" as part of an apparent effort to restructure the company's debt.

39. In connection with that application, Energy Coal formed a wholly owned subsidiary, Energy Coke, in order to transfer its petcoke business to an apparently solvent wholly owned and controlled entity through which it could continue to conduct its petcoke business with its suppliers and trading partners in the United States while it attempted to reorganize its debt in Italy.

40. Pursuant to a Lease Agreement dated April 10, 2015 (the "Lease Agreement"), a copy of which is attached hereto as Exhibit 4, Energy Coal leased its petcoke business, including existing contracts with customers and suppliers, equipment, furniture, fittings, office machinery and IT systems along with their licenses, employee contracts, receivables from customers and office space, to Energy Coke, in exchange for an annual rental fee consisting of (1) a fixed yearly sum of Euro 480,000.00 plus (2) a variable yearly sum of between 40% and 60% of the positive EBITDA (earnings before interest, taxes, depreciation, and amortization) of Energy Coke from its carrying out and furthering Energy Coal's petcoke business.

41. In the Lease Agreement, the parties stipulated regarding the purported basis for the Lease Agreement as follows:

> The suppliers of petcoke, for the most part large groups listed on the stock exchange, cannot – due to company policy – do business with companies undergoing insolvency procedures or similar proceedings, so the contractual relationship with Energy Coal cannot continue in its current fashion;
>
> In order to safeguard the important (and fundamental for purposes of the petcoke trading activity) business relationship with the

8

> above-mentioned suppliers by transferring it to a solvent subject, on March 25, 2015 Energy Coal established Energy Coke, in which it has a 100% shareholding, to which to rent the Company Branch [i.e. petcoke business].
>
> The renting out of the Company Branch [i.e. petcoke business], contributing to ensuring the continuity of the Company and along with it, its employment levels, is consistent with the goals pursued by Energy Coal in resorting to Art. 161, paragraph 6, Financial Law (restructuring of debt as per Art. 182 Bis Financial Law, or preventative agreement for company continuity)….

(See Ex. 4). Upon information and belief, and as explained more fully below, the stated basis for the Lease Agreement as purported by the parties above is merely an effort to disguise the true intention of the parties – to prevent creditors of Energy Coal, including XO, from obtaining security and enforcing valid claims.

42. During the pendency of the lease agreement, Energy Coal retains both a present beneficial interest in Energy Coke's operation of the leased petcoke business as well as a future reversionary interest. Such interests constitute property of Energy Coal that is subject to attachment pursuant to Rule B.

43. Upon information and belief, Energy Coke is presently scheduled to load a cargo of petcoke on board a vessel now calling or soon to call at the port of Wilmington.

44. Based upon prior business practices, Energy Coal chartered the vessel for carriage of the cargo and bills of lading were issued identifying Energy Coal as shipper. It is expected that the present shipment will follow suit.

45. Energy Coke and, by reason of the foregoing, Energy Coal are believed to have an attachable interest in that cargo which has been or will be loaded on board the vessel. For these reasons, the cargo is subject to attachment pursuant to Rule B to serve as security in support of Plaintiff's claims herein.

**ALTER EGO LIABILITY**

46. In the alternative, notwithstanding the notion of corporate separateness, by reason of the beneficial ownership and dominating control of Energy Coal over Energy Coke, Energy Coal and Energy Coke are so intertwined and indistinguishable that they operate as and are, in fact, a single business enterprise pursing a single business purpose for the ultimate benefit of Energy Coal.

47. By way of background, and as noted above, Energy Coal is incorporated in Italy and is engaged in the trading of petcoke and other coal products internationally.

48. Energy Coal formed Energy Coke in March 2015 specifically to enable Energy Coal to continue to carry out its petcoke business with its U.S. suppliers and trading partners through a wholly owned and controlled, and apparently solvent, entity, while Energy Coal attempts to restructure its debt in Italy.

49. Energy Coke is, however, upon information and belief, undercapitalized. According to information obtained from the Chamber of Commerce in Italy, Energy Coke has a share capital of only EURO 10,000. Yet, under the Lease Agreement, Energy Coke is obligated to pay to Energy Coal: (1) a fixed sum of Euro 480,000 per year; and (2) a variable yearly sum of between 40% to 60% of the positive EBITDA of Energy Coke. (See Exhibit 5, copy of Italian Chamber of Commerce documents issued for Energy Coke; see also Exhibit 4 copy of Lease Agreement).

50. Energy Coal and Energy Coke (as well as their ultimate parent entity, Ice Holding Srl[2]) all share the same registered office and operate out of the same principal place of business

---

[2] Energy Coal is a majority owned subsidiary of Ice Holding Srl, an entity also incorporated in Italy. Ice Holding Srl is owned by Mr. Ascheri Agusto (holding 53.6% of the shares) and Ms. Bianchi Maria Cristina (holding 46.4% of the shares). (See Exhibit 8 copy of Italian Chamber of Commerce document for Ice Holding Srl).

in Italy at Via San Vincenzo, 2 A – 16121 Genova.  (See Exhibit 6, printouts from websites published by Energy Coal and Energy Coke available online at http://www.energycoal.com/ (last viewed: June 4, 2015); see also Exhibits 5 and 7 copies of Italian Chamber of Commerce documents issued for Energy Coal and Energy Coke, respectively).

51. Energy Coal, Energy Coke and Ice Holding Srl share identical registered email accounts at energycoal@legalmail.it, energycoke@legalmail.it and iceholding@legalmail.it.

52. In addition to sharing common ownership, addresses and contact information, Energy Coal and Energy Coke also share overlapping management.

53. The sole Director of Energy Coke, Mr. Paolo Ascheri, is also the CEO of Energy Coal as well as a minority shareholder in Energy Coal.  (See Exhibits 5 and 7, copies of Italian Chamber of Commerce documents issued for Energy Coal and Energy Coke, respectively).

54. Mr. Paolo Ascheri's apparent relative, Mr. Augusto Ascheri, is the majority shareholder of the ultimate parent entity Ice Holding Srl, the sole director of that parent entity and the President of the Board of Directors of Energy Coal.  (See Exhibit 8, copy of Italian Chamber of Commerce documents issued for Ice Holding Srl).

55. In addition, another Energy Coal affiliate named Energy Shipping S.P.A. has made multiple payments on behalf of Energy Coal under charter parties entered into between Energy Coal and third parties.  (See Exhibit 9).

56. By virtue of and through its relationship with Energy Coke and its other affiliates, Energy Coal is pursuing, furthering and carrying out its petcoke business with its suppliers and trading partners in the United States, albeit in the name of Energy Coke, in an apparent effort to avoid efforts by creditors of Energy Coal, including XO, from obtaining security for their claims.

57. Energy Coke has no separate or independent identity from Energy Coal and exercises no independent business decision over the direction of its business and acts merely as a shell for the benefit of Energy Coal and its shareholders.

58. Based on the foregoing, Energy Coal and Energy Coke are *alter egos* of one another in that Energy Coke is actually carrying out the business of Energy Coal as if it were its own, and all obligations, liabilities and debts of Energy Coal as a result are in fact those of Energy Coke.

59. Energy Coal and Energy Coke should therefore be considered a single economic unit with no corporate distinction between or among them, rendering each liable for the debts of the other, and all assets of Defendants together should be susceptible to attachment and/or restraint for the debts of Energy Coal.

## FRAUDULENT CONVEYANCE

60. In the further alternative, as set forth in detail above, and in an attempt to evade Energy Coal's creditors, including XO, Energy Coal and Energy Coke have engaged in a scheme to transfer the assets and operations of Energy Coal's petcoke business to Energy Coke. More specifically, in connection with the transfer of Energy Coal's petcoke operations to Energy Coke, Energy Coal and Energy Coke jointly and severally intentionally depleted Energy Coal of its assets and transferred such assets from Energy Coal to Energy Coke.

61. The transfers alleged herein were done with the actual intent to hinder, delay, or defraud XO and other creditors of Energy Coal.

62. In the alternative, the transfers alleged herein were made without Energy Coal having received reasonably equivalent value in exchange for such transfers and were made at a

time when Energy Coal was either insolvent or the value of the transfers far exceeded Energy Coal's remaining assets.

63.     In addition, upon information and belief, (i) the transfers were made to an entity wholly controlled by Energy Coal and an Energy Coal insider; (ii) the transfers were concealed from XO; (iii) the transfers were of all or substantially all of Energy Coal's assets; and (iv) the transfers occurred shortly before or after Energy Coal incurred the substantial debt to XO described herein.

64.     As a result of these fraudulent conveyances, XO seeks (i) an order authorizing the attachment of the transferred assets; (ii) an order setting aside and disgorging the transfers to the extent necessary to secure the satisfaction of XO's claim herein and in aid of arbitration; (iii) an injunction against Defendants preventing further disposition of the assets fraudulently transferred from Energy Coal to Energy Coke and/or the others; (iv) appointment of a receiver to take charge of the assets; and (v) any other relief the circumstances may require.

## Request for Rule B Relief

65.     Upon information and belief, and after investigation, Defendants cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have, or will shortly have, assets within this District comprising, *inter alia*, goods, cargo, cash, funds, escrow funds, credits, debts, accounts, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants (collectively hereinafter, "ASSETS), including a cargo scheduled to be loaded on board a vessel in the port of Wilmington in the hands of certain garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

439518.1

66. The total amount to be attached pursuant to the calculations set forth above is **USD460,946.31.**

WHEREFORE, Plaintiff prays:

a. That process in due form of law according to the practice of this Court may issue against the Defendants, citing them to appear and answer the foregoing, failing which default may be taken;

b. That if Defendants cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendants up to and including **USD460,946.31** be restrained and attached, including, but not limited to any goods, cargo, cash, funds, escrow funds, credits, debts, accounts, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants (collectively hereinafter, "ASSETS), including a cargo scheduled to be loaded on board a vessel in the port of Wilmington in the hands of certain garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c. That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to an order compelling Defendant to arbitrate and/or the recognition and enforcement of any award or judgment entered against the Defendants in the London proceedings; and

d. For such other, further and different relief as this Court may deem just and proper, including but not limited to a default with respect to any property seized in the event a timely response is not filed.

Dated: September 22, 2015

                                            PALMER BIEZUP & HENDERSON LLP

                                            By:  /s/ Michael B. McCauley
                                                  Michael B. McCauley
                                                  1223 Foulk Road
                                                  Wilmington, DE 19803
                                                  Tel.: (302) 594-0895
                                                  Email: mccauley@pbh.com
                                    Attorneys for Plaintiff XO Shipping A/S

OF COUNSEL:

FREEHILL HOGAN & MAHAR, LLP
Michael E. Unger
Susan Lee
80 Pine Street
New York, NY  10005
Tel.: 212-425-1900
Fax: 212-425-1901
Email: unger@freehill.com
       lee@freehill.com
Attorneys for Plaintiff XO Shipping A/S

15

439518.1

## ATTORNEY VERIFICATION

Michael B. McCauley declares as follows:

1. I am a partner in the law firm of PALMER BIEZUP & HENDERSON LLP, attorneys for Plaintiff in this action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information and documentation provided by Plaintiff and/or by solicitors representing Plaintiff.

3. The reason this verification is made by an attorney and not by the Plaintiff is that Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

4. I declare under penalty of perjury that the foregoing is true and correct.

5. Executed on September 22, 2015.

                                      /s/ Michael B. McCauley
                                      Michael B. McCauley

439518.1